RECORD NUMBER: 14-1405

# United States Court of Appeals

### *for the*

# Fourth Circuit

**RAYFIELD AVIATION, LLC,**

*Appellant,*

– v. –

**LYON AVIATION, INC.,**

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO

# BRIEF OF APPELLEE

**ERIC D. WELSH**
**SARAH F. HUTCHINS**
**PARKER, POE, ADAMS**
**&BERNSTEIN, LLP**
**3 Wells Fargo Center**
**401 South Tryon Street**
**Suite 3000**
**Charlotte, NC 28202**
**(704) 335-6639**

*Counsel for Appellee*
*Lyon Aviation, Inc.*

CP  COUNSEL PRESS • VA – (800) 275-0668

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1405__    Caption: __Rayfield Aviation, LLC v. Lyon Aviation, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Lyon Aviation, Inc.__
(name of party/amicus)

_____

who is __Appellee__, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                         ☐YES ☑NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                     ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: 5/9/14

Counsel for: Lyon Aviation, Inc.

## CERTIFICATE OF SERVICE
*****************************

I certify that on 5/9/14 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

```
James Robert Faucher
Benson Brown & Faucher, PLLC
822 N Elm Street, Suite 200
Greensboro, NC  27401
```

_____                         5/9/14
       (signature)                                (date)

- 2 -

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES .................................................................... iii

JURISDICTIONAL STATEMENT ............................................... 1

STATEMENT OF THE ISSUES .................................................... 1

STATEMENT OF THE CASE AND FACTS ............................................ 2

    A.    Entry into the Agreement ........................................... 2

    B.    Invoices, Payments and the Conduct of the Parties .................. 6

    C.    Termination of the Agreement and the subsequent lawsuit ..... 11

SUMMARY OF ARGUMENT .................................................... 14

STANDARD OF REVIEW ......................................................... 18

ARGUMENT ................................................................ 20

    I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE AGREEMENT UNAMBIGUOUSLY ALLOWS LYON TO RECOUP ITS INCIDENTAL EXPENSES ............................................................ 21

    II.    RAYFIELD'S ATTEMPT TO IMPUTE AMBIGUITY INTO AN UNAMBIGUOUS AGREEMENT IS WITHOUT MERIT ............................................... 33

    III.    EVEN IF THE AGREEMENT WERE AMBIGUOUS, LYON'S INTERPRETATION IS CORRECT ........................ 36

        A.    Pre-negotiation conduct ................................. 37

        B.    Rayfield's conduct during the Agreement .................... 39

i

      C.    Rayfield's bonus payments to Lyon .............................. 42

      D.    Rayfield's position has been inconsistent ...................... 43

      E.    Operation of the Agreement pursuant to Rayfield's interpretation would be commercially unreasonable ..... 45

IV.    RAYFIELD'S BREACH OF CONTRACT CLAIM IS BARRED BY THE DOCTRINES OF ESTOPPEL AND WAIVER AS A MATTER OF LAW ...................................... 34

CONCLUSION ............................................................................ 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

EXHIBIT A: *Rhodes v. Peoples Plaza*, 884 F.2d 1389 (1989)

# TABLE OF AUTHORITIES

**Cases:**

*42 East, LLC v. D.R. Horton, Inc.,*
 722 S.E.2d 1 (N.C. Ct. App. 2012).........................................49, 51, 52

*Amwest Sur. Ins. Co. v. Vaughn,*
 100 F. Supp. 2d 335 (E.D.N.C. 2000) .................................................53

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242, 106 S.Ct. 2505 (1986) ....................................18, 19, 48

*Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co. of Raleigh,*
 129 N.C. App. 525, 500 S.E.2d 108 (N.C. Ct. App. 1998) ..........21, 34

*Celotex Corp. v. Catrett,*
 477 U.S. 317, 106 S.Ct. 2548 (1986) ...........................................18, 19

*Center for Blood Research, Inc. v. Coregis Ins. Co.,*
 305 F.3d 38 (1st Cir. 2002)...................................................................34

*Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,*
 40 F.3d 146 (7th Cir. 1994) ................................................................34

*Cleveland Construction, Inc. v. Ellis-Don Construction, Inc.,*
 210 N.C.App. 522, 709 S.E.2d 512 (N.C. Ct. App. 2011) ...........49, 50

*Cordaro v. Singleton,*
 31 N.C. App. 476, 229 S.E.2d 707 (N.C. Ct. App. 1976) .................37

*Creech v. Melnik,*
 347 N.C. 520, 495 S.E.2d 907 (N.C. 1998).......................................53

*Cullen v. Valley Forge Life Ins. Co.,*
 161 N.C. App. 570, 589 S.E.2d 423 (N.C. Ct. App. 2003) ...............51

*Davidson v. Duke University,*
 282 N.C. 676, 194 S.E2d 761 (N.C. 1973).......................................40

iii

*DeBruhl v. State Highway. & Pub. Works Comm'n*,
    245 N.C. 139, 95 S.E.2d 553 (N.C. 1956).......................................... 45

*Emmanuel African Methodist Church v. Reynolds Const. Co.*,
    217 N.C. App. 176, 718 S.E.2d 201 (N.C. Ct. App. 2011) .......... 21, 25

*Fairbanks, Morse & Co. v. Twin Cities Supply Co.*,
    170 N.C. 315, 86 S.E. 1051 (N.C. 1915)............................................ 45

*Federal Realty Inv. Trust v. Belk-Tyler of Elizabeth City*, *Inc.*,
    56 N.C.App. 363, 289 S.E.2d 145 (N.C. Ct. App. 1982) ............. 40, 43

*Felty v. Graves-Humphreys Co.*,
    818 F.2d 1126 (4th Cir. 1987) ...................................................... 19, 37

*Hagler v. Hagler*,
    319 N.C. 287, 354 S.E.2d 228 (N.C. 1987)....................................... 21

*Hawaiian Ass'n of Seventh Day Adventists v. Wong*,
    305 P.3d 452 (Haw. 2013) ................................................................. 34

*Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'ship*,
    134 N.C. App. 391, 518 S.E.2d 17 (N.C. Ct. App. 1999) .................. 36

*Hurdle v. White*,
    34 N.C.App. 644, 239 S.E.2d 589 (N.C. Ct. App. 1977) ................... 52

*International Paper Co. v. Corporex Constructors, Inc.*,
    385 S.E.2d 553 (N.C. Ct. App. 1989)........................................... 21, 25

*Karp v. University of North Carolina*,
    78 N.C. App. 214, 336 S.E.2d 640 (N.C. Ct. App. 1985) .................. 45

*Koontz v. Ameritech Servs., Inc.*,
    645 N.W.2d 34, 466 Mich. 304 (2002) .............................................. 34

*Lagies v. Myers*,
    142 N.C. App. 239, 542 S.E.2d 336 (N.C. Ct. App. 2001) ............... 39

iv

*Mackey v. Shalala,*
    360 F.3d 463 (4th Cir. 2004),
    *cert. denied*, 543 U.S. 876 (2004)...................................................... 18

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574, 106 S.Ct. 1348 (1986) ................................................ 18

*Medearis v. Trustees of Meyers Park Baptist Church,*
    148 N.C. App. 1, 558 S.E.2d 199 (N.C. Ct. App. 2001) ............. 51, 52

*Metropolitan Property & Cas. Ins. Co. v. Dillard,*
    126 N.C.App. 795, 487 S.E.2d 157 (N.C. Ct. App. 1997) ................ 53

*Mikels v. City of Durham,*
    183 F.3d 323 (4th Cir. 1999) ............................................................ 18

*Millennium Inorganic Chems. Ltd. v. National Union Fire Ins. Co.*
*of Pittsburgh,*
    744 F.3d 279 (4th Cir. 2014) ............................................................ 35

*Novacare Orthotics & Prostehtics E., Inc. v. Speelman,*
    137 N.C. App. 471, 528 S.E.2d 918 (N.C. Ct. App. 2000) ............... 39

*Orsi v. Kirkwood,*
    999 F.2d 86 (4th Cir. 1993) .............................................................. 46

*Patterson v. Taylor,*
    140 N.C. App. 91, 535 S.E.2d 374 (N.C. Ct. App. 2000) ................. 39

*Poor v. Hill,*
    138 N.C. App. 19, 530 S.E.2d 838 (N.C. 2000) ............................... 20

*Quorum Health Resources, LLC v. Hugh Chatham Mem'l Hosp., Inc.,*
    552 F. Supp.2d 527 (M.D.N.C. 2007) ........................................ *passim*

*Register v. White,*
    358 N.C. 691, 599 S.E.2d 553 (N.C. 2004) ................................. 35, 36

*Rhodes Construction Corp. v. Peoples' Plaza West, LTC.,*
    884 F.2d 1389, 1989 WL 100678 (4th Cir. 1989) ............................. 51

*Robbins v. Trading Post*,
  253 N.C. 474, 117 S.E.2d 438 (N.C. 1960)........................................ 22

*Root v. Allstate Ins. Co.*,
  272 N.C. 580, 158 S.E.2d 829 (N.C. 1968)........................................ 37

*Ross v. Communications Satellite Corp.*,
  759 F.2d 355 (4th Cir. 1985) ............................................................. 19

*Silvers v. Horace Mann Ins. Co.*,
  324 N.C. 289, 378 S.E.2d 21 (N.C. 1989)......................................... 39

*Singleton v. Haywood Elec. Membership Corp.*,
  357 N.C. 623, 588 S.E.2d 871 (N.C. 2003)....................................... 27

*Smith v. DenRoss Contracting, U.S., Inc.*,
  737 S.E.2d 392 (N.C. Ct. App. 2012)........................................... 49, 50

*State v. Fenner*,
  263 N.C. 694, 140 S.E.2d 349 (N.C. 1969)....................................... 28

*Taylor v. Gore*,
  161 N.C. App. 300, 588 S.E.2d 51 (N.C. Ct. App. 2003) ................. 53

*Teamsters Local 391 v. Ball Corp.*,
  355 F. Supp 2d 803 (M.D.N.C. 2005) .................................. 21, 36, 37

*Whitaker v. Old Dominion Guano Co.*,
  123 N.C. 368, 31 S.E. 629 (N.C. 1898)............................................. 28

## Rules, Statutes, and Other Authorities:

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1332 ...................................................................................... 1

F.R.C.P. 56(c) ........................................................................................ 18

F.R.C.P. 56(e) ........................................................................................ 19

N.C. Gen. Stat. §§66-317 (2007) ................................................................ 52

http://dictionary.reference.com/browse/incidental ....................................... 28

http://dictionary.reference.com/browse/term ................................................ 34

## JURISDICTIONAL STATEMENT

Appellant Rayfield Aviation, LLC ("Rayfield") filed its Complaint on April 7, 2011, in the United States District Court for the Middle District of North Carolina ("District Court") pursuant to 28 U.S.C. § 1332 based on diversity jurisdiction, asserting claims for breach of contract and "accounting" against Appellee Lyon Aviation, Inc. ("Lyon"). After an earlier Opinion and Order granting summary judgment in favor of Lyon as to Rayfield's "accounting" claim, (*see* JA 83-84), which Rayfield has not appealed, the District Court issued an Memorandum Opinion and Order (the "Opinion") granting summary judgment in favor of Lyon and dismissing Rayfield's remaining breach of contract claim. (JA 189-210). Rayfield filed a Notice of Appeal to this Court as to the March 31, 2014 Order and Opinion on April 25, 2014. (JA 212). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the District Court properly found that Lyon was entitled to judgment as a matter of law on Rayfield's claim that Lyon breached the Agreement, where the Agreement is only reasonably susceptible to Lyon's interpretation and the evidence demonstrates that Lyon did not breach the Agreement?

1

2.     Whether the District Court properly denied Rayfield's motion for partial summary judgment?

## STATEMENT OF THE CASE AND FACTS

Rayfield is a limited liability company based in North Carolina. (JA 85, ¶1, 134, ¶1).   Rayfield's assets during the relevant time frame included a 1988 Gulfstream G-IV jet aircraft (the "Aircraft"). (JA 589).  Lyon is a family owned Massachusetts corporation with its principal place of business in Pittsfield, Massachusetts. (JA 85, ¶2, 134, ¶2, 559, ¶3, 1372, ¶3, 1768, ¶3).  Lyon provides, among other things, charger flight operations and charter aircraft management services. (JA 559, ¶4).

## A.     Entry into the Agreement

Beginning in March of 2009, Rayfield and Lyon began negotiating a business relationship between the two companies.  (JA 218, ¶3, 559, ¶5).  The negotiations were principally conducted between George Townsend, representing Rayfield, and Mike Lyon, representing Lyon.  (*Id*.; JA 361-362, 559-560, 598). Mike Lyon initially provided Townsend with a bullet-point list of proposed terms on March 6, 2009, and Rayfield's attorney revised these terms and drafted an agreement.  (JA 560, ¶7, 665, 669-706, 1491).  Multiple drafts of the proposed agreement were prepared by Rayfield's attorney and provided to Lyon.  (*See e.g.*, JA 774-810, 811-853, 996-1034, 1035-1073, 1074-1113).

Up to and until the agreement was signed, the parties engaged in correspondence regarding its proposed terms. Among the items of discussions was the treatment of expenses. On April 29, 2009, and immediately prior to the execution of the negotiated agreement, Townsend wrote Lyon to clarify the treatment of expenses. Townsend wrote:

> Also, I have just one more comment about the contract that I do want to bring up before we sign. This is a revisit of our previously agreed specifications and I realize that. It's not a huge deal to me either way but in final reading it does seem odd the way we are doing this one thing. We say in the section that defines Charter Revenue that it excludes incidental expenses charged to clients for costs associated with overnights, landing fees, catering, deicing, etc. What seems odd is that these expenses, or at least some of them, are expenses that we would be paying for. I believe we would be paying for the landing fees, deicing, and crew overnight costs, etc. If we are paying for them why would we not get the revenue? It seems to boggle up what is otherwise so simple an agreement. [sic]

(JA 729).

Mike Lyon responded "[t]he misc. expenses like landing fees, de-icing etc. would be paid directly by Lyon and removed from the [C]harter [R]evenue prior to Lyon submitting the revenue. It's going to be easier for both parties to handle this way. If this is unclear we should discuss." (*Id*.). Townsend responded: "Sounds good. Thanks for clearing that up." (*Id*.; JA 1436-1439). On this date, correspondence was also exchanged between Townsend and Joe Hardy, Rayfield's attorney involved in drafting the Agreement, on this same subject. (JA 739-741). Joe Hardy agreed with Mike Lyon's written exchange and reminded Townsend that

3

Rayfield was "not paying for overnight or other incidental expenses that are passed on to the customers." (*Id.*; *see also* JA 1441-1439).

The parties entered into the Aircraft Lease and Management Services Agreement (the "Agreement") on May 1, 2009, for a term of up to three years. (JA 669-706). Under the terms of the Agreement, Lyon would conduct international charter flights, using Rayfield's Aircraft. (JA 673, §3.1). Rayfield would lease Lyon the Aircraft and pay a monthly management fee of $26,666.67 to Lyon. (JA 672, §2.17, 676, §5.1, 705, ¶3).[1] In return, Lyon would pay Rayfield a rental amount that was dependent upon the prior month's Charter Revenues, as defined by the Agreement and calculated under Section 4.1. (JA 675-676, §4.1). During the term of the Agreement, Lyon paid Plaintiff Charter Revenues in the amount of $5,091,310.47. (JA 570, ¶7, 576, 911, 1529).

Under Section 2.7 of the Agreement, Charter Revenue consisted of "100% of (a) the actual invoice charges for such flights, (b) the fuel surcharges for such flights, and (c) all forfeited deposits, or other amounts realized from cancelled or delayed flights," but specifically excluded "incidental expenses charged to the charter customers associated with overnights, landing fees, catering, deicing taxes, and similar expenses." (JA 670, §2.7). The actual invoice charges component of

_____

[1] Approximately 75% of this fee was used to pay pilot and co-pilot salaries. (JA 569-570, ¶¶4-8). Over the course of the Agreement, Lyon received $576,657.56 in gross management fees which provided Lyon with a net profit of approximately $18,000.00. (JA 912-914).

4

the Charter Revenue was calculated under Section 4.1 by the invoiced charter hours multiplied by a set hourly rate. (JA 607-613, 618, 632-635, 649, 656, 675-676, §4.1, 737-738, 742-747, 750-751, 902, 940-941, 951-952, 986-989, 995, 1380-1381, ¶¶9-14; *see generally* JA 1204-1340). Under Section 4.1, Rayfield would receive, as Charter Revenue, 100% of the hourly charter rate for the first 150 charter hours invoiced in any three month period, and thereafter, Lyon would receive 15% of the hourly rate as a bonus (while Plaintiff received 85%) for every excess charter hour. (JA 675-676, §4.1, 1709).

A number of expenses are incurred incidental to an international charter flight. (JA 562, ¶17). The possible expenses that could occur on any international flight number in the hundreds, and would vary based on the destinations visited, the weather, the flight path, and the time of year, among other things. (JA 562-563, ¶¶17-19, 640-641, 716-717, 916-917). Examples of these incidental expenses include, but are not limited to, the following: overflight fees (using a country's airspace), navigation expenses, international landing fees, routing expenses, catering, lavatory fees, parking fees, ramp fees, flight attendant fees; fees for additional flight crew and a credit card conversion fee. (JA 562-563, ¶¶ 17-19, 628-631, 726-727).

Responsibility for the representative expenses rested with Lyon. Under Section 3.6 of the Agreement, Lyon was responsible for paying the costs of

5

incidental expenses for the charter flight: "[Lyon] shall be responsible for all costs of flight crew, incidental expenses, [and] other costs for all flights conducted by [Lyon] in the Aircraft while under Lease. (JA 675, §3.6, 1410-1414). These expenses covered in Article 3, such as landing fees, certain taxes and other similar expenses, were explicitly excluded from the definition of "Charter Revenues" in Section 2.7 and were thus not part of the "Rent" owed, as set forth in Article 4. (JA 670, §2.7).

The Agreement provided for Lyon to pass the cost of the incidental expenses on to its charter customers, as Rayfield readily acknowledged during the negotiation of the Agreement. (JA 620-627, 728-730, 739-741) (Rayfield is "not paying for overnight or other incidental expenses that are passed on to the customers."). Thus, under the Agreement, Rayfield did not pay for the cost of the incidental expenses nor did it receive the payments from Lyon's charter customers for the reimbursement of the incidental expenses as "Charter Revenue." (JA 561, ¶¶11-12, 603-604, 720-723, 1449-1452). In other words, since Lyon was responsible for paying such expenses associated with the charter flight to third parties, and bore the sole risk of obtaining payment from its customers in reimbursement for such expenses, Lyon would retain any such amounts remitted for such expenses. (JA 1410-1414, 1419).

**B.**    **Invoices, Payments and the Conduct of the Parties**

Following execution of the Agreement, Lyon managed and operated the Aircraft for private charter flights, primarily international flights, for Rayfield. Throughout the relationship, Lyon consistently sent Rayfield monthly statements setting out the Charter Revenue for that month, in accord with the provision of Section 4.1, of flight hours times the set rate, plus fuel surcharges. (JA 608, 1421-1427, 1488, 1496; *see also* JA 369-552, 575-576, 743-747, 1205-1340, 1384-1385, 1525-1527, 1532-1542, 1552, 1714-1716, 1737-1739, 1784-1785, 1931-1936). Lyon also included with each monthly statement to Rayfield copies of the invoices presented to the customer for that charter flight and the flight logs. (*Id.*; JA 1421-1427).

The customer invoice contained a charge for the estimated flight time but also separate charges for expenses expected to be incurred as a result of the flight. (JA 1496-1500; *see also* JA 369-552, 575-576, 743-747, 1205-1340, 1384-1385, 1525-1527, 1532-1542, 1552, 1714-1716, 1737-1739, 1784-1785, 1931-1936). Some expenses could vary as flight conditions, planned flight paths, and other variables changed. (*Id.*) These varying incidental expenses could include up to 100 different outlays for one charter flight which would be billed directly to Lyon after the flight's conclusion by various third parties. (JA 562, 1496-1500). A number of fees, include overflight fees, navigation expenses, international landing fees,

7

routing expenses, catering, lavatory fees, parking fees, towing fees, and ramp fees, could be difficult to predict.  (JA 562-563).  Rather than itemize these fees and burden its customers with a lengthy invoice full of a multitude of individual expenses, many of which would not be known with certainty until weeks or even months after the conclusion of the flight, Lyon's invoices to its customers summarized these estimated expenses as "handling fees."[2]  (JA 349, 562-563, 715-719 1496-1500).  These fees were estimated and included in the flight quote given to Lyon's prospective customer and were paid contemporaneous with the flight.  (JA 606-607, 713-714, 733-36, 1496-1500).   In the event that a given flight's expenses exceeded the estimated "handling fees" billed to the customer, Lyon, not Rayfield, was responsible for any shortfall.   (JA 599-606, 675, 1410-1414).  Rayfield was aware that Lyon estimated these expenses in the invoices to Lyon's customer.  (JA 572, 606-607, 654).

Upon the conclusion of each month, Lyon reported the prior month's charter flight activity to Rayfield.  (JA 1421-1427, 1488, 1496).  Lyon's report to Rayfield included a revenue summary chart, outlining each charter flight flown for the prior month organized by flight, and providing Rayfield with the flight itinerary, charter flight hours, and fuel surcharges.  (*See e.g,.* JA 369-552, 575-576, 743-747, 1205-

---

[2]   It is common industry practice to group together various charges and label them as "handling fees," a point admitted by Rayfield's proffered expert.  (JA 1574-1576).

8

1340, 1384-1385, 1421-1427, 1516-1517, 1525-1527, 1532-1542, 1552, 1662-1663, 1714-1716, 1737-1739, 1784-1785, 1931-1936).    Copies of invoices that Lyon issued to its customers were also provided to Rayfield as support for the revenue summary chart. (*Id.*; s*ee also* JA 1421-1427, 1662-1663).  The customer invoices, reflecting both Charter Revenue and reimbursement of Lyon's expenses incidental to the flight, again listed the total amount invoiced, calculated by multiplying hours by rate, and the fuel surcharges.  (JA 571-572; *see e.g.,* JA 1516-1517).  The "handling fees" and other incurred expenses, would appear separately on the invoice.  (*See e.g.,* JA 369-552, 575-576, 743-747, 1205-1340, 1384-1385, 1421-1427, 1525-1527, 1532-1542, 1552, 1662-1663, 1714-1716, 1737-1739, 1784-1785, 1931-1936).

Consistently, Lyon sent these monthly reports to Rayfield, along with the revenue payment and Rayfield accepted these wire payments without any objection for over a year.  (JA 571-572, ¶¶9-14, 639-640, 742-747, 754, 756-757, 763, 938-962, 965-977, 980-984, 1199-1203, 1421-1427, 1488, 1449-1452, 1496, 1666).  Rayfield scrutinized the invoices and occasionally raised questions concerning various items on them, but not once during the first year did Rayfield raise a question about the "handling fees" which were clearly stated on the invoices.  (JA 571-572, ¶¶9-14, 918-23, 938, 947-50, 962-968, 1347-1349, 1352-1371, 1360-1362, 1421-1427, 1453-1454, 1488, 1594, 1632, 1671).    Importantly, Rayfield

9

repeatedly commended Lyon's performance under the Agreement and even entered into an additional airplane agreement with Lyon for management of another aircraft a year after the parties had been operating under this Agreement. (JA 613-619, 1114-1116, 1117-1154). In addition, twice during the course of the contract (the fourth quarter of 2009 and the second quarter of 2010), Lyon received bonus payments from Rayfield, payments which were owed under Section 4.1 only if Lyon were not in default under the Agreement and "[had] paid to [Plaintiff] in full all Charter Revenues billed and collected for such period and for all prior months during the term." (JA 675-676; *see also* JA 985-990, 993-995, 1518-1519, 1523, 1696-1699).

On May 7, 2010, Townsend, for the first time, raised a question over the treatment of handling fees by Lyon under the Agreement, but even here, did not take the position (as it does now) that such amounts, regardless of substantiation, was owed to Rayfield. (JA 757, 639-640, 954-962, 964, 967-968, 972-976, 1201-1202, 1453-1456, 1666-1670). And while Rayfield subsequently requested support for the amount of the "handling fees" not included in Charter Revenue, Rayfield did not raise a single question or issue about customer charges for landing fees, overflight fees or flight attendant fees prior to this lawsuit, all of which Rayfield now claims it is entitled to under the Agreement. (JA 1453-1456, 1666-1670).

10

**C.**    <u>**Termination of the Agreement and the subsequent lawsuit**</u>

Between May of 2010 and Rayfield's termination of the Agreement in January of 2011, the parties continued their course of operation under the Agreement while engaging in ongoing discussions as to the "handling fees" issue. (JA 708, 1201-1202, 1890-1891).  Rayfield continued to accept Lyon's remittance of Charter Revenue during this time.  (JA 1666).  Following termination of the Agreement, and prior to the instant litigation, Rayfield's then counsel sent Lyon a pre-litigation demand letter ("Schoolman Letter"), a document admitted by Rayfield that it authorized to be sent on its behalf.  (JA 776-769, 772, 904-907, 1602-1605).  In the Schoolman Letter, Rayfield repeatedly, and with great clarity, confirmed that it "understood that Lyon would reimburse itself for those actual incidental expenses by deducting those actual amounts from charter revenue remitted to Rayfield." (*Id*.).  The Schoolman Letter again characterized the dispute as one over the support for the reimbursement of the incidental expenses, and not Lyon's ability to credit itself for the outlay of those expenses at all.  (*Id.* (asking Lyon to "substantiate the amounts," "show that Lyon actually incurred and paid these handling charges," and threatening litigation if "the original records do not reflect these specific amounts as actual costs incurred by you.")).  Nowhere in the Schoolman Letter does Rayfield state, as it does now, that Rayfield is entitled to the "handling fees," irrespective of substantiation, and nowhere does Rayfield

11

make claim to other expenses invoiced to customers, such as landing fees, overflight fees or flight attendant fees, as it does now, even though such expenses were delineated clearly on the copy of the invoices provided to it monthly by Lyon.

Rayfield filed its original verified complaint on April 7, 2011 ("Verified Complaint"), bringing a claim for an "accounting" and damages for breach of contract.[3] (JA 21-26). Significantly, Rayfield's original breach of contract claim, consistent with its position stated in the Schoolman Letter, alleged a breach of the Agreement based only on handling fees that could not be substantiated by Lyon as having been incurred. (*Id.*, "Lyon materially breached the Agreement by claiming entitlement to retain 'handling fees' that are substantially greater than the actual amounts incurred by Lyon."); s*ee also* JA 772, 904-907, 1601-1602). (emphasis added). Lyon moved for summary judgment on Rayfield's "accounting" claim, which the District Court granted. (JA 83-84). Rayfield subsequently filed an amended complaint ("Amended Complaint") asserting the instant and sole claim for breach of contract based on alleged failure to pay all Charter Revenue, though this time also including other invoiced expenses such as, landing fees, overflight

---

[3] It is undisputed that Lyon has satisfied its contractual obligations other than the contested amount of revenue allegedly owed to Rayfield. (*See e.g.* JA 986-990, 995). Rayfield alludes to a purported breach that Lyon did not provide certain documents under the Agreement, but no such claim is made in the Amended Complaint. The entirety of Rayfield's claim for breach rests on the allegation that Lyon failed to pay amounts purportedly owed under the Agreement. (*See* JA 91, ¶¶ 34-35).

fees or flight attendant fees. (JA 85-94). Lyon answered, asserting certain affirmative defenses. (JA 31-32, 139-142). Both Rayfield and Lyon each moved for summary judgment as to the remaining breach of contract claim on April 22, 2013. (JA 177-188).

In support of its doomed claim, Rayfield contended before the District Court that while the Agreement does permit Lyon to retain payments from customers for incidental expenses, which Rayfield considered as a deduction from the Charter Revenue owed in Rent, the "handling fees" retained by Lyon did not qualify as incidental because they were not—in Rayfield's unsupported and unilateral view— "minor." (JA 181, 1472-1473, 1477). Rayfield's argument then, as now, was based on its ever-meandering view of Section 2.7 to the exclusion of the contract as a whole. In contrast, Lyon correctly set forth that a reading of the entire Agreement shows that Charter Revenue simply does not include incidental expenses, which, under a plain reading of the whole Agreement, means expenses that accompany a charter flight. (JA 670-676, §§ 2.7-4.1). Lyon paid all amounts owed under the Agreement and did not breach the Agreement. Moreover, Lyon argued correctly that even if the Agreement was ambiguous, the extrinsic evidence of pre-contract negotiation, as well as the extensive history of operation under the Agreement in complete accordance with Lyon's position, clearly showed that Lyon's interpretation is correct and that Lyon did not breach the Agreement. The

13

District Court, finding Lyon's position correct as to the interpretation of the Agreement, either based on its plain reading or a review of the extrinsic evidence, granted Lyon's motion for summary judgment, denied Rayfield's motion for partial summary judgment and entered judgment in Lyon's favor. (JA 189-211).

## SUMMARY OF ARGUMENT

Rayfield largely duplicates its prior incorrect, and ultimately unsuccessful, summary judgment arguments in its appeal. Rayfield argues that the Agreement is unambiguous, but then intermingles unsupported arguments of "industry practice" to reach its incorrect conclusion that the Agreement required Lyon to remit reimbursement for third-party imposed expenses as "revenue" to Rayfield. Rayfield, essentially starting and stopping its argument on one part of one paragraph of the Agreement – the first sentence of Section 2.7 – demands that because an expense appeared on a customer invoice, albeit listed as a separate line-item, the language of Section 2.7 somehow awards that money to Rayfield. Rayfield further argues that even were the Agreement to permit Lyon to charge customers for incidental expenses and retain such amounts, the Agreement only allows for "minor" subtractions and is limited to those specifically listed. (JA 1595-1598). To make this argument, Rayfield imposes words and terms into the Agreement that are not present, focuses incorrectly on one provision of the Agreement to the exclusion of the others, ignores the fact that such a reading

14

renders specific clauses meaningless, and distorts the entire reading of the Agreement.

First, a reading of the whole Agreement demonstrates that Lyon owed Rayfield "Rent" in the amount of the Charter Revenue, which was calculated under Section 4.1 by multiplying the flight hours times set rate, plus fuel surcharges and any cancellation fees.  Lyon was solely responsible for payment to third parties of expenses associated with a charter flight, bearing the risk of obtaining payment from its customers in reimbursement for such expenses, under Section 3.6, and such incidental expenses were expressly excluded from Charter Revenue in Section 2.7.    (JA 1410-1414, 1419).  Charter Revenue simply did not include expenses, which Lyon listed on its customer invoices individually and by the label "handling fees."  (*See* JA 670-676, §§2.7-4.1). Rayfield's strained interpretation, which confuses revenue with expenses, simply does not bear up to the facts and does grave injury to well-established principles of North Carolina law on contract interpretation, which is the governing law.  (*See* JA 1449, 1634-1635, 1638, 1646-1657).

Second, Rayfield's forced reading of the word incidental to mean "minor" is improper and cannot in any event be used to create an artificial ambiguity when none exists under the Agreement through a reading of the whole document.  Again, to make its argument, Rayfield must overlook the language of the Agreement

15

listing examples of expenses incidental to the flight, which are dissimilar except for being incurred with respect to the charter flight, and the fact that that there is no monetary distinction within the Agreement, a point conceded by Rayfield.  (JA 1416-1417, 1443, 1473).  The plain language of the Agreement provides that Lyon bears the responsibility for paying the expenses incurred from third parties with respect to the charter flight, and expenses incidental to the charter flight were excluded from Charter Revenue, whether based on some arbitrary determination of Rayfield of "minor" or not. (JA 1410-1414).  Rayfield's reading is unreasonable and inconsistent, both with the Agreement and its prior actions and statements, and further does not create an ambiguity requiring remand.

Third, even if the Agreement was read to be ambiguous, the extrinsic evidence overwhelmingly proves that Lyon's interpretation is correct and as such, Lyon did not breach the Agreement by retaining the customer reimbursement for the incidental expenses.  For example,

- The pre-contract discussions between the parties, as evidenced in email exchanges, addressed and clarified the very issue of which Rayfield now complains and supports Lyon.  (JA 620-627, 728-730, 739-741);

- Both parties' conduct during the term of the Agreement showed knowing accord with Lyon's interpretation of the calculation of Charter Revenue.  (JA 608, 1421-1427, 1488, 1496);

- Rayfield did not voice any objection to Lyon's retention of the "handling fees" encompassing incidental expenses for over a year, even though Rayfield received and reviewed like clockwork the statements and invoices from Lyon monthly;

16

- Lyon was paid two bonuses under the Agreement, calculated again pursuant to the understood hours multiplied by rate calculation, and which were only to be paid absent a default by Lyon and after remittance of all Charter Revenue owed to Rayfield – an admission that Lyon did not breach the Agreement by not remitting to Rayfield the handling fees and other reimbursed expenses. (JA 570, 575-576, 1518-1519, 1523);

- Rayfield's pre-litigation statements and admissions in this very lawsuit demonstrate that Rayfield's interpretation of the Agreement has blown with the wind, previously contending that Charter Revenues only included unsubstantiated "handling fees," and now include *all* expenses on the customer invoice, whether substantiated or not, unless they are limited to certain expressly enumerated items, "minor" (unilaterally defined by Rayfield as 1-2%) (*see* JA 1443-1444), invoiced separately to the customer and only after the charter flight; and

- Rayfield's interpretation is commercially unreasonable as it would require Lyon to remit as "revenue" the reimbursement of expenses incidental to the charter flight—expenses which Lyon, not Rayfield, was responsible for paying to third parties—and force Lyon to operate at a continuing loss.

The District Court found the extrinsic evidence dispositive of the dispute and in favor of Lyon. (JA 206-210). Rayfield's desperate attempt to salvage its claim by suggesting that Lyon fraudulently altered or withheld relevant invoices is unavailing. Rayfield made no claim of fraud in the Amended Complaint and, its argument is, in any event, without support.[4] (JA 1620 (where Rayfield states that he has "no proof" of altered invoices)). Finally, while the District Court did not address the issue, Rayfield's claim is barred by Lyon's defenses, including that

---

[4] This is a tired refrain from Rayfield that is wholly baseless. Lyon has produced the documents requested by Rayfield in the lawsuit, only redacting the names of its customers to protect such information from disclosure to Rayfield, as permitted by Order of the District Court. (JA 69, 83-84). Rayfield did not appeal that Order. Nor did Rayfield file any other motion after the Order regarding any deficiencies it perceived in Lyon's production.

17

Rayfield is estopped from arguing a different interpretation of the Agreement than the one it acted under for the term of the Agreement and that Rayfield further waived any default through continued and long-term unchallenged acceptance of the Charter Revenue paid.  Summary Judgment in favor of Lyon should be affirmed.

## STANDARD OF REVIEW

The standard of review for decisions granting summary judgment is *de novo*. *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004), *cert. denied*, 543 U.S. 876 (2004); *Mikels v. City of Durham*, 183 F.3d 323, 328 (4th Cir. 1999).  Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment will be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  F.R.C.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2551 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party must show that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355 (1986).  Only disputes over facts that might affect the outcome of the suit will properly preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-2510 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *See id*. Instead, the moving party is entitled to judgment as a matter of law unless a fair-minded jury could return a verdict for the nonmoving party on the evidence presented. *See id*. at 247-48, 106 S.Ct. at 2510. To successfully oppose a motion for summary judgment, the nonmoving party is required to make a showing sufficient to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2551.

Rule 56(e) requires the nonmoving party to go beyond the pleadings and "by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324, 106 S.Ct. at 2553. Conclusory allegations or denials, without more, will not preclude the granting of a summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985); s*ee also Anderson*, 477 U.S. at 247-249, 106 S.Ct. at 2510. Indeed, the Fourth Circuit has stated with regard to summary judgment motions that the district courts have "an affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2552-2553).

19

Rayfield appeals the granting of summary judgment in Lyon's favor as to the sole contract claim, and the denial of its own motion for summary judgment regarding the same. In the instant appeal, Rayfield reiterates its arguments before the District Court and ostensibly argues that the reasoned opinion of the lower court was simply incorrect. Rayfield continues to argue that Charter Revenues included everything listed on the invoice and paid by the customer, including expenses, and that the Agreement further intended the exclusion of only "minor" expenses invoiced *after* the fact. Rayfield's position, however, is belied by the terms of the Agreement, fatally wounded by its ever-changing position regarding the meaning of Section 2.7 and ultimately defeated by the overwhelming extrinsic evidence that demonstrates the façade of its position.

## ARGUMENT

In its single cause of action, Rayfield applies a distorted and confusing reading into an otherwise straightforward contract in an attempt to manufacture a breach of the Agreement by Lyon. A breach of contract requires (1) a valid contract and (2) a breach of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (N.C. 2000). Here there is simply no breach.

Rayfield accuses Lyon of breaching the Agreement by retaining payments for invoiced expense items that Lyon received from its charter customers rather than remitting such amounts to Rayfield as "revenue." Lyon denies that it

breached the Agreement, asserting that Rayfield's revenue is set by Section 4.1 and 2.7, and expenses are expressly excluded under Section 2.7 and 3.6. In essence, the dispute turns on two different interpretations of the Agreement. The District Court properly found for Lyon based on a reading of the contract and separately based on the extrinsic evidence. *See Teamsters Local 391 v. Ball Corp.*, 355 F. Supp 2d 803, 809 (M.D.N.C. 2005).

## I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE AGREEMENT UNAMBIGUOUSLY ALLOWS LYON TO RECOUP ITS INCIDENTAL EXPENSES

When a contract is clear and unambiguous, the proper operation of the contract may be determined as a matter of law. *Hagler v. Hagler*, 319 N.C. 287, 294, 354 S.E.2d 228, 234 (N.C. 1987). A finding of ambiguity in an otherwise clear agreement is valid only where the language of a contract is fairly and reasonably susceptible to either interpretation posed. *See Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co. of Raleigh*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (N.C. Ct. App. 1998). As the District Court correctly found, the Agreement, read as a whole, is only susceptible to one reasonable interpretation: Lyon's.

A contract must be considered in its entirety, a bedrock principle in the law that Rayfield repeatedly violates. *See Emmanuel African Methodist Church v. Reynolds Const. Co.*, 217 N.C. App. 176, 178, 718 S.E.2d 201, 203 (N.C. Ct. App. 2011) (quoting *International Paper Co. v. Corporex Constructors, Inc.*, 385 S.E.2d

21

553, 555-56 (N.C. Ct. App. 1989))("It is well settled that a contract is construed as a whole….Individual clauses are to be considered in context.  All parts of the contract will be given effect if possible."); *Quorum Health Resources, LLC v. Hugh Chatham Mem'l Hosp., Inc.*, 552 F. Supp.2d 527, 532-533 (M.D.N.C. 2007); *Robbins v. Trading Post*, 253 N.C. 474, 477, 117 S.E.2d 438, 440-41 (N.C. 1960). Contract law requires that "since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety.  The problem is not what the separate parts mean, but what the contract means when considered as a whole." *Quorum*, 552 F.Supp.2d at 532; *Robbins*, 253 N.C. at 477, 117 S.E.2d at 440-441.  Here, Lyon's obligation of payment to Rayfield cannot be found under a single provision of the Agreement (Section 2.7) as Rayfield contends, but rather, through the entirety of the Agreement and the interplay, in particular, of Sections 4.1, 2.7 and 3.6.  Indeed, as the District Court noted, "[t]he Agreement must be read as a whole, and Section 4.1 informs Section 2.7."  (JA 202).

Section 4.1, which sets forth the manner in which Lyon remits to Rayfield Charter Revenue, provides that Lyon is to charge its charter customers based on an hourly rate, plus fuel surcharges, for each flight on the G4.  (JA 675-676, §4.1). Section 2.7, a provision describing Charter Revenue, includes "the actual invoice charges for such flights" and the fuel surcharges for such flights, but consistent with Section 3.6, expressly excludes "incidental expenses charged to the charter

22

customers" for the charter flight.  (JA 670, §2.7).  The term "actual invoice charges for such flight" is not expressly defined in Section 2.7 but as Section 4.1 reads on Section 2.7, the "actual invoice charges" to be provided as revenue to Rayfield is the hourly charge invoiced by Lyon to its customers, plus the fuel surcharge.  (*See* JA 202 ("In context, it is clear that 'actual invoice charges' refers to the hourly charges for the G4; this revenue was to be supplemented by fuel surcharges.").  Expenses incidental to the charter flight are simply and explicitly not included as Charter Revenue.

The express exclusion of incidental expenses in Section 2.7 is wholly consistent with the remaining terms of the Agreement, and specifically Section 3.6, which provides that Lyon, not Rayfield, bears sole responsibility for paying and collecting on costs associated with the charter flight. (JA 670, 1410-1414). Rayfield admits that Lyon alone bore this obligation to third parties, to the extent of even stating that under its terms, Rayfield would not compensate Lyon for any shortfall it sustained in seeking reimbursement of these expenses from Lyon's customers.  (JA 992 ("it was unequivocally clear that [Lyon] paid all the operating expenses and [Rayfield] got all the revenue."); *see also* Brief of Appellant, filed June 20, 2014 ("Appellant Brief") at 10; JA 626-627, 629, 631, 713, 1410-1414). Since Lyon was obligated to pay these expenses under Section 3.6, Lyon certainly is permitted to obtain reimbursement for such expenses from its charter customers

without such payment suddenly metamorphosing from an expense to a revenue item, as set forth in Section 2.7.  (JA 562-563, 572, 606-608, 628-631, 652-654, 669-676, 713-719, 733-736).[5]

Rayfield contends that it is entitled *all* monetary amounts appearing on an invoice to the charter customer, whether expense or revenue, and that Charter Revenues therefore includes expenses such as "handling fees."  (JA 1449, 1634-1635, 1638, 1646-1657).  In addition to basing its incorrect assertion on a strained reading of Section 2.7 in isolation, Rayfield's interpretation ignores the fact that Section 2.7 defines revenue, not expenses.  The fact that an expense item is placed on an invoice along with a revenue item does not suddenly turn the expense item into revenue.  (JA 563, 894-899, 903, 924-930, 931-937; *see also* the Opinion of the District Court at JA 202 ("Rayfield's interpretation of the Agreement also strains the accepted meanings of 'revenue' and 'expenses.'").  Moreover, Rayfield's interpretation would render Section 2.7(b) meaningless as fuel surcharges are listed separately on the charter customer invoice.  (*See e.g.*, JA 742-747, JA 1207-1340).  As an interpretation is only reasonable when meaning is given to all provisions of the contract and does not render portions of the contract

---

[5]    Rayfield's President readily admits that Lyon had no obligation under the Agreement to invoice the expenses it incurred to its customers.  (JA 1585, 1615). Yet under Rayfield's theory, if Lyon decided to invoice its customers for such expenses, any amounts Lyon received would be revenue to Rayfield, not Lyon. This is illogical.

24

meaningless.  *Emmanuel*, 217 N.C. App. at 180, 718 S.E.2d at 204 (quoting *International Paper*, 385 S.E.2d at 556), Rayfield's interpretation   must be rejected.

Rayfield has itself admitted that Charter Revenues do not include expenses but rather are based on hours of invoiced flight time multiplied by Rayfield's set rate – Lyon's interpretation of the Agreement.   Under Section 4.1, Lyon was entitled to a bonus of "15% of the *Charter Revenues* collected in excess of the Charter Revenues collected for the first 150 hours of such period."  (JA 675-676, §4.1, 1709) (emphasis added).   It is uncontested that Rayfield paid Lyon two bonuses and that such bonuses were calculated based on hours multiplied by the set rate.  (*See e.g.*, JA 575-576, 1205 ("188.3 hrs - 150 hrs = 38.3 excess hrs x. $4950/hr = $189,585.00 x. 15% - $28,437.75"); *see also* JA 675-676, 1518-1519, 1523, 1696-1701, 1709).   If Rayfield were correct, which it is not, Rayfield should have paid Lyon 15% of this revenue plus the expenses it claims.  It did not do so— twice.  *Id*.  This is an admission that Charter Revenues does not include expenses.

Rayfield's current interpretation is further undermined by its own allegations.  In its original Verified Complaint, Rayfield tellingly did **not** assert that Lyon did not have the right under the Agreement to retain the "handling fees." Similarly, in the Schoolman Letter, a pre-litigation letter that Rayfield admits it authorized, Rayfield's counsel confirmed that "Rayfield understood that Lyon

would reimburse itself for the actual incidental expenses…." (JA 766-769, 772, 904-907, 1602-1605). This letter—as with the Verified Complaint—also did not raise objections to landing fees, overflight fees or flight attendant fees, and no claim is made for it in the Verified Complaint. (JA 964-965, 1688-1689). Rather, Rayfield's unmistakable position was that Lyon had to remit payment for any amount of handling fee that was not substantiated as having been paid by Lyon. (JA 21-26). Indeed, that is the very purpose for why Rayfield brought its "accounting" claim.[6] (*See e.g.*, JA 1601). Rayfield's prior position, while still in error under Sections 4.1, 2.7 and 3.6, is a position that is diametrically opposed to its current position that *all* amounts on the invoice to the customer is Charter Revenue, whether an expense or not, and whether the payment of the expense is substantiated or not. (JA 1449, 1634-1635, 1638, 1646-1657). And significantly, Rayfield's previous position in this case is an admission that Lyon is indeed correct that expenses are not Charter Revenue due to Rayfield**.** (JA 21-26).

Rayfield attempts to dismiss the exclusionary language of Section 2.7 by arguing that this language was only to include "minor" or "small" expenses charged to a charter customer. (Appellant Brief at 21-22; *see* JA 766-769 ("It is Rayfield's understanding that 'incidentals' as defined in Section 2.7 were to be

---

[6] If Rayfield were correct that handling fees are not permitted incidental expenses under the Agreement. as it now contends, then there would have been no reason to have sought an accounting to see if the handling fees were legitimately paid.

*incidental smaller* expenses actually paid for by Lyon.  Rayfield understood that Lyon would reimburse itself for those actual incidental expenses …")(emphasis added); s*ee also* JA 772, 904-907, 1602-1605).  Rayfield's argument, however, would require a re-writing of the Agreement, as Rayfield admits that the Agreement does not contain such a monetary limitation or even the words "*minor*" or "incidental *smaller* expenses," as its former counsel tried to impose.  (*Id*.; JA 1416-1417, 1443, 1473).

Rayfield agrees that a "court looks to the term's 'meaning in ordinary speech, unless the immediate context clearly indicates another meaning was intended.'" (Appellate Brief at 15-16 (quoting *Singleton v. Haywood Elec. Membership Corp*., 357 N.C. 623, 629, 588 S.E.2d 871, 875 (N.C. 2003)).  The meaning of "incidental" in the context of the Agreement could not reasonably be given a definition of "minor."  First, Section 2.7 lists number of examples of expenses that can occur.  (JA 670).  This sentence, however, is not an exhaustive list of the excluded expenses, which Rayfield admits (JA 605, 624, 908-909, 1606-1607; *see also* JA 666-667, 1416-1417, 1443, 1473, 1482-1483, 1622 (where Rayfield admits that "overflight permits," not listed in Section 2.7, may still be considered incidental)).  Rather, the section concludes with "and similar expenses," interpreted by Townsend previously as "etc" (JA 729) so as not to limit the "incidental expenses" to those specifically listed—such expenses encompassed a

27

multitude of fees and taxes. It is clear that "incidental" expenses could not easily be defined in the Agreement.

Rayfield endeavors to limit these expenses under a flawed theory of *ejusdem generis*. *See Whitaker v. Old Dominion Guano Co*., 123 N.C. 368, 31 S.E. 629 (N.C. 1898). The theory, however, is inapplicable as it is limited to lists that share a designation of the same kind, character and nature of the specific categories listed. *Id*. The incidental expenses that are identified in the Agreement are significantly different from one another—there is no "like" type or common characteristic. *See State v. Fenner*, 263 N.C. 694, 697-698, 140 S.E.2d 349, 352 (N.C. 1969) (*ejusdem generis* does not apply where there is no common characteristic). The sentence in which "incidental expenses" are referenced provides examples of unrelated charges that are only similar in that they are incurred with respect to the charter flights and are subordinate or in addition to the regular or main amount—i.e. the actual invoice charges for the Charter Revenue which were paid to Rayfield. (*See* the definition of "incidental" on Dictionary.com http://dictionary.reference.com/browse/incidental (last visited July 20, 2014) (incidental defined in the adjective and descriptive sense as "happening or likely to happen in an unplanned or subordinate conjunction with something else; incurred casually and in addition to the regular or main amount; likely to happen or naturally appertaining.") *see also* JA 1562-1564). The term "similar expenses,"

when read with the preceding "incidental expenses," can only reasonably mean all additional and ancillary expenses incurred in the course of chartering a flight. This reading is further buttressed when read in conjunction with Section 3.6. As the District Court correctly observed:

> Under Rayfield's interpretation, if a charter flight incurred significant expenses due to circumstances outside of Lyon's control (such as, for example, high overflight fees or other expenses associated with international flights), Rayfield would be entitled to receive those expenses though it bore no responsibility to pay for them under the Agreement. This stretches the language far beyond anything the parties could have intended at execution.

(JA 203).

As properly concluded by the District Court, it is incomprehensible that Rayfield should benefit from the expenses billed to Lyon by third parties. (JA 202-203).

In an attempt to salvage its interpretation of "incidental" as "minor" or "small," Rayfield initially argued to the District Court that a time requirement existed for when an expense could be an "incidental expense" and when it was allegedly "revenue." (*See* JA 1588-1591, 1759-1760; *see also* JA 201 ("all charges on Lyon's *initial* invoice to a client constitute 'Charter Revenue,' but concedes that expenses billed later do not.")(emphasis in the original)). Rayfield now expands the argument to exclude under Section 2.7 only *small* expenses that arise in flight and are invoiced to the customer *after* the flight. Rayfield states: "What is not Charter Revenue, and what does not belong to Rayfield, are certain incidental

expenses that occasionally come up during the flight that were not part of the 'actual invoice charge' and are actually charged to the customer *after* the flight." (Appellant Brief at 18) (emphasis added).  Rayfield's argument fails for several additional reasons.

First, Rayfield attempts to re-write the Agreement by inserting not only some uncertain monetary limitation, but also a temporal limitation.  There is no provision, however, stated in the Agreement requiring invoicing to occur at any time to be considered an incidental expense.  Rayfield concedes this point.  (JA 1591 ("I would agree that [a billed separately requirement] is not written in the contract" and "that's language [Rayfield] added" in deposition.)).  As stated by the District Court, "'[p]lainly, nothing in the Agreement supports any interpretation that is arbitrarily based on the temporal nature of the charge."  (JA 201).

Second, Rayfield's strained reading would result in a completely illogical outcome.  By way of example, Rayfield's Appellate Brief indicates that if Lyon quoted a customer $50,000 for a charter trip, the entire $50,000 is thereafter owed to Rayfield.  (Appellant Brief at 3-4).  By Rayfield's logic, *all* estimated expenses contemplated *before* the charter flight are Rayfield's gain, whether documented in Section 2.7 or not, but regardless of the fact that Lyon is to pay the third party under Section 3.6.  And, under Rayfield's argument, if the flight was diverted and "substantial" additional expenses were incurred by Lyon, *Rayfield,* not Lyon*,*

30

should also receive payment for those additional high expenses, as they are not "minor." This outcome is absurd. In such a situation, Lyon would incur more and more expense which it could not avoid, and then be left with the choice of either not invoicing the customer at all for the expenses or invoicing the customer but then remitting all amounts for those expenses to Rayfield, with the net result that Lyon does not cover its expenses with third parties from its customers. Rayfield's unsupported assertion that this gives incentive for Lyon to reduce its costs is meritless as the additional expenses are completely outside of Lyon's control and in any event always present.

Rayfield's argument is additionally flawed in that it is dependent on factually incorrect and unsupportable extrinsic evidence regarding its view of "industry practices," an argument it did not raise with the District Court. As Rayfield has declared the Agreement "crystal clear," and indeed has moved for summary judgment on the basis of an unambiguous contract, such attempts to rely on "industry practice" must be rejected here in interpreting the plain meaning of the contract. (*See e.g.*, Appellant Brief at 12, 18; JA 1603). Even if "industry practice" were considered, Rayfield presents no competent evidence to support its assertions, and in any event, consideration of the extrinsic evidence, including industry practice, would support Lyon's interpretation, not Rayfield's. *See infra* at 37, n. 11. Moreover, Rayfield's argument here, while purporting to rely on

31

statements by Lyon regarding industry practice, completely ignores repeated testimony that expenses are largely unknown and therefore estimated before the flight. (JA 606-607, 713-714, 733-36, 1496-1500). There simply is no temporal requirement or distinction in the Agreement.

Similarly, Rayfield attempts to insert extrinsic evidence into its contract argument by repeatedly arguing that its contract with Lyon was not a "standard aircraft management agreement." (*See e.g.*, Appellant Brief at 4). Besides the fact that Rayfield again improperly attempts to subtly interweave purported extrinsic evidence into its summary judgment argument to assist its interpretation of the unambiguous contract,[7] Rayfield still fails to explain why, under this structure, *Rayfield* would thereafter be reimbursed for expenses *Lyon* paid. Rayfield argues that this Agreement incentivizes Lyon to reduce its costs, apparently also decreasing Rayfield's alleged Charter Revenue in the process. This argument is also illogical. One point is certain and not disputed by Rayfield: if the G4 is flown on international charters, it will incur substantial expenses. (JA 305, 716-717). And the more the plane is flown, the more those expenses will occur. In addition,

---

[7] Indeed, if one were to consider extrinsic evidence that led up to the parties' execution of the contract, as Rayfield invites, then one only need look at the exchange of emails between Rayfield's Townsend, who negotiated the Agreement, and Mike Lyon, which squarely addressed and resolved this issue in Lyon's favor. *See infra* at 30-31. Rayfield's argument in light of this clear email exchange continues to raise serious issues with respect to ongoing frivolous nature of this appeal.

those expenses from third parties, such as landing fees or overflight fees, are outside of the control of Lyon. Forcing Lyon to turn over the reimbursement to Rayfield, under the guise of encouraging Lyon to "keep costs low," is not only ridiculous, but a commercially unreasonable interpretation of the Agreement. Rayfield's logic only incentivizes Lyon to not fly at all to avoid the incursion of additional expense. Rayfield's forced and inaccurate reading of the Agreement is grossly inequitable and does not balance the obligations of the parties in the way that Lyon's reasonable interpretation does. *See Quorum*, 552 F.Supp. 2d at 533.

The only reasonable reading of the Agreement is that of Lyon's. The language of the Agreement unmistakably provides that Rayfield was entitled to Rent based on the hours of invoiced flight time multiplied by Rayfield's set rate, plus fuel surcharges and forfeited deposits and cancellation fees, not incidental expenses, regardless of monetary amount, date of incursion or appearance on (or absence from) the invoice. Any other interpretation of the Agreement is unreasonable.

## II.    RAYFIELD'S ATTEMPT TO IMPUTE AMBIGUITY INTO AN UNAMBIGUOUS AGREEMENT IS WITHOUT MERIT

In an attempt to continue its baseless litigation, Rayfield now argues that, even if the word "incidental" does not mean "minor," its definition is subject to multiple interpretations and is therefore ambiguous and inappropriate for summary judgment. Rayfield's simple allegation of ambiguity does not make it so—the

theory must also be reasonable.  *See Barrett Kays*, 129 N.C. App. at 528, 500 S.E.2d at 111.  Rayfield's new allegation of ambiguity is based entirely on the fact that "incidental" is subject to at least two definitions—the adjective describing expenses incurred "casually and in addition to the regular or main amount" and the noun of "incidentals" or "minor."  (Appellant Brief at 24).  As discussed above, Rayfield improperly reads the term "incidental" in isolation.  As noted by the District Court, "the fact that a dictionary provides multiple definitions of a words used in a contract does not render the contract ambiguous.  Ambiguity in a contract 'is found to exist…only when the contract taken as a whole, is reasonably subject to differing interpretation.'" (JA 204); *Hawaiian Ass'n of Seventh Day Adventists v. Wong*, 305 P.3d 452, 467 (Haw. 2013); *see also Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 152 (7th Cir. 1994); *Center for Blood Research, Inc. v. Coregis Ins. Co*., 305 F.3d 38, 41 (1st Cir. 2002); *Koontz v. Ameritech Servs., Inc*. 645 N.W.2d 34, 42, 466 Mich. 304 (2002).[8]  A term of the agreement, read in isolation, may appear ambiguous or subject to multiple interpretations until it is given context from the remainder of the agreement.  *See Quorum*, 552 F.Supp.2d at 532-533 ("The problem is not what the separate parts

---

[8] As noted by the District Court, North Carolina has not directly addressed the issue of whether multiple dictionary definitions automatically create an ambiguity in a contract, the reasoning of other courts in other jurisdictions on this point is persuasive and consistent with North Carolina law regarding interpreting a contract as a whole.  (*See* JA 204,  n. 12).

mean, but what the contract means when considered as a whole."). Here, the term "incidental" is not ambiguous when read in the context of the Agreement. *See supra* at 23-24

Many common contractual phrases, when read alone, may be subject to multiple definitions—this does not, in turn, make all of these contracts ambiguous. For example, a word common to many contracts, "term," is subject to multiple definitions: (1) a word or group of words designating something or (2) a time or period through which something lasts. See the definition of "term" on Dictionary.com http://dictionary.reference.com/browse/term (last visited July 20, 2014). The phrase, read in isolation, "subject to its term" could mean subject to the length of the contract or subject to the language of the contract. Courts often review terms that have multiple dictionary definitions, but only one plain meaning under the contract in question. *See e.g.*, *Millennium Inorganic Chems. Ltd. v. National Union Fire Ins. Co. of Pittsburgh*, 744 F.3d 279 (4th Cir. 2014).

Rayfield cites no support for its contention that multiple dictionary definitions will make a contract uncertain. Rayfield's reliance on *Register v. White* in support of its argument is misplaced. *Register v. White,* 358 N.C. 691, 599 S.E.2d 553 (N.C. 2004). The *Register* case stands for the proposition that to be actually ambiguous, the term must be capable of several *reasonable* interpretations. *Id.* at 695, 599 S.E.2d at 553 (emphasis added). *Register* did not

35

turn on the fact that the term in question was subject to multiple dictionary readings, but rather that the term truly could be interpreted in several reasonable ways that would materially alter the agreement. *Id.*, at 694-696, 599 S.E. 2d at 552-553 (where the court could not decipher from the text of the agreement if the "time limit" in which to bring a claim stated in the insurance contract stemmed from the time of the injury or the time at the plaintiff acquired a contractual right to demand arbitration in the case). Rayfield does not present true and reasonable doubt as to a dual meaning of the word "incidental" in the context of Section 2.7 and the Agreement as a whole. Rayfield's attempt to interject ambiguity into the Agreement must be rejected.

## III.   <u>EVEN IF THE AGREEMENT WERE AMBIGUOUS, LYON'S INTERPRETATION IS CORRECT</u>

Extrinsic evidence is not admissible unless the language of the contract is ambiguous. *See Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'ship*, 134 N.C. App. 391, 397, 518 S.E.2d 17, 23 (N.C. Ct. App. 1999). As set forth above, the Agreement is unambiguous and subject only to the reasonable interpretation that Charter Revenue does not include the expenses incurred and reimbursed through the operation of charter flights. Even if the Agreement were ambiguous, the extrinsic evidence favoring Lyon's view stands overwhelming and uncontested. (JA 206-210); s*ee e.g.*, *Teamsters*, 355 F. Supp 2d at 809 (North Carolina law permits courts to examine extrinsic evidence even when interpreting a contract as a

matter of law).  In a summary judgment motion, where the extrinsic evidence shows that a party's claims are clearly unsupported, the court should not allow the matter to proceed to trial.  *Felty*, 818 F.2d at 1128.  Here, upon evaluation of the extrinsic evidence, there is no genuine issue of fact with respect to the Agreement's proper interpretation and a finding that Lyon did not breach the Agreement.

### A.    <u>Pre-negotiation conduct</u>

The negotiations between Rayfield and Lyon show the intention of the parties at the time that they made the contract and clearly support Lyon's interpretation.  *Root v. Allstate Ins. Co.*, 272 N.C. 580, 588, 158 S.E.2d 829, 835 (N.C. 1968); *Teamsters*, 35 F.Supp.2d at 810, 812-813; *Cordaro v. Singleton*, 31 N.C. App. 476, 479-480, 229 S.E.2d 707, 709-710 (N.C. Ct. App. 1976) (evidence of prior negotiations supported the court's determination of the parties intent).  The pre-negotiation conversations directly laid out the intention of the parties on the issue of which Rayfield now complains.  In two telling pieces of correspondence, the parties, and also Rayfield's then attorney, discussed the exact matter at issue:

 <u>April 29, 2009 email correspondence between George Townsend and Mike Lyon:</u>

Townsend to Lyon: "**I believe we would be paying for the landing fees, deicing, and crew overnight costs, etc.  If we are paying for them why would we not get the revenue?**"

Lyon's response to Townsend:  "**The misc. expenses like landing fees, de-icing etc. would be paid directly by Lyon and removed from the charter revenue**

37

prior to Lyon submitting the revenue.  It's going to be easier for both parties to handle this way.  If this is unclear we should discuss."

Townsend's reply to Lyon: "**Sounds good.  Thanks for clearing that up.**"  (JA 728-30, 620-627)(emphasis added).

April 29, 2009 email correspondence between George Townsend,
Plaintiff's Attorney Joseph Hardy, and Mike Lyon:

In response to Townsend's original question to Lyon above, Attorney Hardy stated:  "**Rayfield is only responsible for those listed overnight costs in the case of one-way charter flights, and only if those costs are not passed on to Lyon's charter customers. You are not paying for overnight or other incidental expenses that are passed on to the customers.**"

Townsend's response to Attorney Hardy: "**OK. I understand.**"  (JA 739-741, 620-627)(emphasis added).

During the pre-contractual negotiations, Rayfield stated that discussions with Lyon had "cleared up" which party was responsible for expenses."  (JA 728-30, 620-627, 1603).  There is no evidence that the parties discussed any kind of monetary limitation.  Additionally, Rayfield acknowledged that it likewise understood its attorneys' interpretation of the Agreement that incidental expenses would be paid by Lyon's customers (as opposed to by Lyon).  (JA 1402). The extrinsic evidence shows that Rayfield understood Lyon would be responsible for incidental expenses passed onto customers and Rayfield was not getting the revenue for such expenses prior to execution of the Agreement.  Rayfield cannot now abandon this position and argue the opposite, nor can it show that the parties did not have the same intent at the time of execution of the Agreement.

38

Moreover, to the extent any ambiguity exists here in the wording of the Agreement, such ambiguity should in any event be construed against Rayfield as the primary drafter of Section 2.7. *Novacare Orthotics & Prostehtics E., Inc. v. Speelman*, 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (N.C. Ct. App. 2000). It is well-established that a contract is to be construed strictly against its drafter. *See e.g.*, *Silvers v. Horace Mann Ins. Co*., 324 N.C. 289, 378 S.E.2d 21, 25 (N.C. 1989). Though Mike Lyon sent his original bulleted list of potential terms to Rayfield, Rayfield's attorney, Joe Hardy, thereafter drafted the Agreement, modifying the terms. (JA 560, ¶7, 665, 1491). Notably, Mike Lyon's list did not include the term "and similar expenses," a central phrase as alleged by Rayfield. *See supra* at 23-24; (JA 715-716; *compare* JA 1156-1561 versus JA 774-810). The evidence shows that Rayfield and its attorney controlled the drafting and chose the material phrases in dispute (JA 590-594, 665-667, 712, 1402).

The pre-contractual conduct unequivocally supports Lyon's interpretation and demonstrates that Lyon did not breach the Agreement.

**B.**    **Rayfield's conduct during the Agreement**

In addition to looking at the intent of the parties before execution of the Agreement, the parties conduct during the course of the contract may also be considered to determine the parties' intent at signing, and in this case, is telling. *Patterson v. Taylor*, 140 N.C. App. 91, 97, 535 S.E.2d 374, 378 (N.C. Ct. App.

2000); *Lagies v. Myers*, 142 N.C. App. 239, 247, 542 S.E.2d 336, 342 (N.C. Ct. App. 2001) (where the language of a contract is ambiguous, courts may consider the parties' construction of the contract after its execution); *Federal Realty Inv. Trust v. Belk-Tyler of Elizabeth City, Inc.*, 56 N.C.App. 363, 367, 289 S.E.2d 145, 148 (N.C. Ct. App. 1982); *Davidson v. Duke University*, 282 N.C. 676, 713-14, 194 S.E2d 761, 784 (N.C. 1973).

The parties operated for the first year of the Agreement without issue. During this time, Lyon consistently sent invoices to Rayfield, detailing the calculation of Charter Revenue as hours times rate, plus fuel surcharges. (JA 608, 1421-1427, 1488, 1496; *see also* JA 369-552, 575-576, 743-747, 1205-1340, 1384-1385, 1525-1527, 1532-1542, 1552, 1714-1716, 1737-1739, 1784-1785, 1931-1936). Lyon also included the invoices sent to the customer. (*Id.*) Rayfield admits that these invoices were clearly stated. (*See* JA 1594 (Rayfield testified, "we could read the paper, yes.")). Rayfield scrutinized all of these summaries and invoices, even to the extent of questioning a charge for a $1,470.00 defibrillator. (JA 1347-1349, 1421-1427, 1488, 1632). Yet, each month, Rayfield accepted each payment without objection for over a year, even when the invoices contained "handling fees" of thousands of dollars (JA 1199-1203, 1539 (showing "handling fees" of $21,000) 1654-1656, 1666-1670). Tellingly, Rayfield even inquired about the backup for one handling fee item, yet did not object to the fact that it was on

the invoice. (JA 1548-1550, 1710-1712). Not until May of 2010, did Rayfield first raise an issue regarding the calculation of Charter Revenue, and then, only to question the amount of the handling fees and not the ability to retain reimbursement for these fees altogether. (JA 1453-1456). In addition, these invoices sometimes contained thousands of dollars of landing fees, yet Rayfield voiced no concern over these items even at the time it filed its Verified Complaint. (JA 21-26, 1636, 1644-1647, 1688-1689). Given that the Agreement was "crystal clear," Rayfield should have objected upon the first invoice and payment. (JA 1603). Rayfield's conduct showed its understanding that it was not owed revenue for ancillary expenses imposed upon Lyon by third parties and reimbursed to Lyon by its customers. Lyon conducted itself openly and Rayfield continued to accept payment.[9] (JA 1199-1203). Rayfield even praised Lyon for its work, stating "a great management job for this period" after receiving an invoice with substantial "handling fees," and recommended Lyon's services to Goldman Sachs. (JA 1115-1116, 1428-1433). Rayfield's conduct is completely inconsistent with its current

---

[9] Throughout the course of the Agreement, Lyon redacted customer names on the invoices it sent to Rayfield. (JA 1488). By order of the Magistrate Judge, and as adopted by the District Court, Lyon was permitted to produce redacted invoices through the course of discovery, as the redacted information "would include business beyond the Agreement and beyond Rayfield, would not be relevant, and would include confidential business information that would put Lyon at a competitive disadvantage if it is required to be turned over to Rayfield. (JA 70, 83-84). Rayfield did not accuse Lyon of any fraudulent practices and Rayfield, even though amending the Verified Complaint once, made no claim of such there.

position in this lawsuit, and inconsistent with a view that Lyon breached the Agreement by not paying handling fees and other expenses to Rayfield, and wholly supportive of Lyon's position.

## C.    Rayfield's bonus payments to Lyon

All the while that Rayfield was receiving the revenue summaries showing the flight time by rate calculation and detailed customer invoices, and accepting payments remitted by Lyon, Rayfield paid Lyon bonuses, praised Lyon's management of the Aircraft and entered into a new contract with Rayfield. (JA 1115-1154, 1199-1206). The bonuses paid to Lyon occurred in January of 2010 and July of 2010, the second payment occurring after Rayfield first questioned the "handling fees" May of 2010. (JA 902, 918-923, 938-955, 958-976, 980-984). Significantly, Lyon was only eligible for a bonus under the Agreement "if (a) no Default or Event of Default by [Lyon] exists hereunder, and (b) [Lyon] has paid to [Rayfield] in full all Charter Revenues billed and collected for such period and for all prior months during the Term…." (JA 675-676). The calculation and payment of bonuses to Lyon under the Agreement (*supra* at 22) coupled with the parties consistent course of conduct throughout the Agreement, are compelling evidence in support of Lyon's interpretation of the Agreement. It is evident that Rayfield, acting with knowledge during the Agreement, did not believe that Lyon had

42

committed acts constituting a breach, otherwise it would not have paid the bonuses to Lyon.

### D.    __Rayfield's position has been inconsistent__

Unlike Lyon, whose conduct and interpretation has remained steadfast, Rayfield's position on the calculation of Charter Revenue has been a moving target.  Courts may give consideration to evidence of the parties' interpretation of a contract prior to the controversy.  *Federal Realty*, 56 N.C. App. at 367, 289 S.E.2d. at 148.  As set forth above, the April 29, 2009 emails involving Rayfield and its attorney show Rayfield's prior understanding that Lyon was responsible for expenses and Rayfield would not receive that revenue.  This is an inescapable conclusion.[10]  Following the execution of that Agreement, Rayfield conducted itself consistent with this position.  For over a year, Rayfield raised no question or concern about the handling fee charges on the invoices, although it raised other questions, (*see e.g.*, JA 1347-1349, 1421-1427, 1488, 1632) and then only

---

[10]   Rayfield places much weight on a single sentence of a letter written by Lyon's outside counsel almost two years after the Agreement was executed.  (Appellant Brief at 23).  Although this pre-litigation letter actually supports *Lyon's* position ("Charter Revenues . . were based on agreed-upon, hourly rates . . which your client received in full"), it is striking that Rayfield would try to have this Court rely on parole evidence some two years after the Agreement was executed, instead of Rayfield's own admissions made on the eve of signing the Agreement regarding the very section that is the subject of its claim.  (*See* JA 728-730, 739-741).  Rayfield cannot point to any evidence prior to the execution of the Agreement that would support its interpretation that would require items that are unequivocally an expense to Lyon become revenue to Plaintiff by merely appearing on a customer invoice.  (JA 1415-1417, 1442-1444, 1470-1473).

questioned as to Lyon's support for the reimbursement, not Lyon's right to seek such reimbursement from its customers and not Lyon's right to retain such monies. (JA 281-284 "We ask that you provide us with source documentation (invoices, receipts, etc.) to illustrate that these amounts were direct reimbursement to you for incidental expenses.…")).   Rayfield also did not question additional expenses itemized on the invoices which were provided to Rayfield, such as landing fees, overnight fees or flight attendant fees until well after the initiation of this lawsuit. (JA 21-26, 766-769).

In the Schoolman letter, sent before litigation, Rayfield's counsel confirmed that **"Rayfield understood that Lyon would reimburse itself for the actual incidental expenses.…"** (JA 766-769) (emphasis added); (*see also* JA 772, 904-907, 1602-1605).  The letter continues to request, repeatedly, documentation for the substantiation of such expenses.  (*Id.*).  This letter also did not raise objections to landing fees, overflight fees or flight attendant fees.  (*Id.*).  Rayfield admits that it authorized its counsel to send this letter to Lyon, and Rayfield never withdrew it. (*Id.*).  Significantly, Rayfield similarly limited its contract claim in the original Verified Complaint, which again brought a claim for an "accounting," and sought only the award of expenses for unsupported handling fees.  (JA 1601, 1688-1689 ("Lyon materially breached the Agreement by claiming entitlement to retain 'handling fees' that are substantially greater than the actual amounts incurred by

44

Lyon.")).  Rayfield now affirms that "evidence from the documents permitted *all* amounts on the invoice" to be remitted to Rayfield.  (*See e.g.*, JA 1449, 1634-1635, 1638, 1646-1657) (emphasis added).  Rayfield has no answer to these compelling and detrimental inconsistencies.  *See Karp v. University of North Carolina,* 78 N.C. App. 214, 216, 336 S.E.2d 640, 641 (N.C. Ct. App. 1985)("admissions of attorneys are binding upon their clients.").

By Rayfield's own testimony, the invoices were clear and showed the calculation of Charter Revenue.  (*See* JA 811-853, 902, 1594).  In such a case, objection should have been instantaneous and interpretation consistent and never wavering, given Rayfield's view of its "crystal clear" terms.  (*See e.g.* JA 1603).  If Rayfield cannot adhere to a clear and consistent understanding, then the Court should give no consideration to its baseless current rendition.

### E.    Operation of the Agreement pursuant to Rayfield's interpretation would be commercially unreasonable

Finally, Rayfield's reading of the Agreement is commercially unreasonable. *See Quorum*, 552 F. Supp.2d at 533; *DeBruhl v. State Highway. & Pub. Works Comm'n*, 245 N.C. 139, 145, 95 S.E.2d 553, 557 (N.C. 1956) (quoting *Fairbanks, Morse & Co. v. Twin Cities Supply Co.*, 170 N.C. 315, 86 S.E. 1051, 1054 (N.C. 1915) ("All instruments should receive a sensible and reasonable construction, and not such a one as will lead to absurd consequences or unjust results.")).  Rayfield makes extensive argument regarding the alternative structure of the Agreement

between the parties, arguing that the Agreement was "carefully designed to promote effective management of sales and expenses and to reward achievement of targeted business results." (Appellate Brief at 4). Despite the fact that it offers no competent evidence to support its argument, the simple fact is that Rayfield's unsupported theory of the Agreement's structure cannot still justify an interpretation that is commercially unreasonable.[11] Surrendering of expense reimbursement from customers to Rayfield would force Lyon to operate at a substantial loss that would only increase the more flights Lyon chartered.

Under the Agreement, Lyon was only paid management fees in the amount of $576,657.56. (JA 1378-1379). Approximately 75% of this amount went to pay pilot and co-pilot salaries and benefits, leaving a remaining sum of $144,164.39 to

---

[11] In its discussion on the purported "performance based" structure of the Agreement, Rayfield improperly cites to the unsworn report of its retained expert, Larry Hughes. (Appellate Brief at 4-5). "It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment" and was not considered by the district court in this matter. *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (citations omitted). Such citation is inappropriate and should not be considered. Further, this position is in conflict with the language of the Agreement, the extrinsic evidence and Lyon's expert, Frank Milan regarding industry practice and revenue owed to owners and the retention of expenses. (JA 44, ¶25 (in the Agreement, "incidental expenses of the international flight, which includes what has been referred to as "handling fees" by Lyon, are not revenue to Rayfield…"); *see also* JA 160-163). Finally, Rayfield cites to an email of Mike Lyon in September 2010 as support of its theory of the structure of the Agreement. (Appellant Brief at 4). Rayfield never inquired of Lyon about this issue in deposition, and offers a single sentence from the email here without explanation. Significantly, the email actually supports Lyon's position in this case regarding the interpretation of the Agreement. (*See* JA 281-284).

cover the remainder of Lyon operational costs. (*Id*.) In total, Lyon's profit on management fees under the Agreement was no more than $18,000 (contrasted by the $5,091,310.47 paid in Charter Revenue to Lyon). (*Id*.; JA 911, 1379, 1386). Rayfield claims entitlement to all amounts invoiced to Lyon's customers, but for "simplicity" or "out of the goodness of its heart" seeks only $822,800.60. (JA 1636, 1644-1648). Denying Lyon the ability to retain such amounts for reimbursement from its customers of third party expenses would cause Lyon to incur an ongoing and substantial operational loss. Even when taking into account additional amounts received by Lyon, as Rayfield suggests, Lyon would still operate at a substantial loss under Rayfield's ever-expansive view of "Charter Revenue." (JA 1378-1379).[12]

Rayfield argues that the "structure" of the Agreement incentivized Lyon to fly more hours. While it is true that Lyon could earn a bonus if it exceeded a certain number of flight hours per quarter, Rayfield's interpretation does not account for the fact that expenses allegedly "owed" to Rayfield would continue to accrue with these increased flights—the more Lyon flies the expense accumulates. It would be impossible to "break even," let alone make a profit, if Lyon is

---

[12] Even when including these additional hanger fees, etc., Lyon could not be profitable if it remitted its expenses to Rayfield. After covering pilot costs, Lyon only received $144,164.39 in management fees, plus $45,812.25 in bonuses. When adding the additional earnings for services outside of the Agreement, Lyon received $437,976.64 under the Agreement, before covering its own operational costs. Applying over $820,000 to Lyon would result in substantial loss.

47

continually attempting to make up the expenses of the prior flight by chartering additional flights (and incurring additional expenses). Rather than participate in a vicious cycle, Lyon would be best served by grounding the Aircraft. Rayfield's argument is commercially unreasonable and should be rejected. *Quorum*, 552 F. Supp.2d at 533.

The extrinsic evidence, including the pre-contractual communications, long term conduct under the Agreement and the fundamental commercial unreasonableness of Rayfield's position overwhelmingly supports Lyon and demonstrates that Lyon is entitled to summary judgment in its favor. Rayfield's attempt to create a material issue of fact in response to this avalanche of evidence fails. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2512 (holding that a mere existence of a "scintilla" of evidence in support of plaintiff's objection to defendant's motion for summary judgment is not sufficient—the evidence on which a jury could reasonably find for plaintiff must exist).

## IV.  RAYFIELD'S BREACH OF CONTRACT CLAIM IS BARRED BY THE DOCTRINES OF ESTOPPEL AND WAIVER AS A MATTER OF LAW[13]

---

[13] Because the District Court properly concluded that the Agreement was unambiguous and Lyon's interpretation was correct, and further, in the event the Agreement was ambiguous, the extrinsic evidence nevertheless supported Lyon's interpretation, the District Court determined that it did not need to address Lyon's alternative arguments that it is entitled to the defenses of waiver and estoppel. A decision by this Court to reverse the District Court's decision should require remand to the District Court to evaluate Lyon's defenses as a matter of law.

48

Rayfield argues that Lyon's defenses are not applicable to Rayfield's breach of contract action and then spends inordinate attention to the defense of laches. Rayfield advances no case law to support its argument that Lyon's defenses of estoppel and waiver do not apply here. Moreover, Rayfield's argument that estoppel and waiver are equitable defenses not available in this breach of contract action is in conflict with established case law. Estoppel and waiver are recognized defenses to breach of contract claims; (1) estoppel may apply where a party accepts a transaction only to later take an inconsistent position and (2) waiver is always based on an express or implied agreement. *See 42 East, LLC v. D.R. Horton, Inc.*, 722 S.E.2d 1, 6-7 (N.C. Ct. App. 2012); *Cleveland Construction, Inc. v. Ellis-Don Construction, Inc.*, 210 N.C.App. 522, 530, 709 S.E.2d 512, 519-520 (N.C. Ct. App. 2011); *Smith v. DenRoss Contracting, U.S., Inc*., 737 S.E.2d 392, 398 (N.C. Ct. App. 2012).

Lyon's performance under the Agreement, and Rayfield's acceptance of performance and payment, done with knowledge, bars the breach of contract claim of which it now complains. Rayfield "scrutinized" the invoices and other materials received from Lyon. (JA 571-572, 918-923, 938, 947-950, 962-968, 1346-1349, 1352-1371, 1360-1362, 1421-1427, 1453-1454, 1488, 1632, 1648-1659). After reviewing the revenue summaries and invoices, which laid out the calculation by which Rayfield's revenues were determined, Rayfield accepted Lyon's approach to

49

"handling fees" for a year without objection. (JA 1199-1203, 1666-1670). What is more, Rayfield never raised objection to reimbursement for specifically categorized fees such as "landing fees" and "flight attendant fees" -- even after questioning the "handling fees" -- until well after the initiation of this litigation. (*See* JA 21-26, 63-81).

Under the doctrine of estoppel, a party who accepts a transaction, and then accepts benefits under it, is estopped from later taking a position inconsistent with its prior acceptance of that same transaction. *Cleveland Construction*, 210 N.C. App. at 530, 709 S.E.2d at 519-520. The purpose of this doctrine is to prevent a party from benefiting by taking two clearly inconsistent positions. *Id.*; *see also Smith*, 737 S.E.2d at 398. The doctrine does not require detrimental reliance and is instead grounded in a "party's acquiescence or acceptance of payment or benefits. *Smith*, 737 S.E.2d at 398.[14]

During the course of the Agreement, Rayfield operated under Lyon's interpretation of the Agreement and accepted Charter Revenues in the amount of $5,091,310.47. (JA 571-572, ¶¶9-14, 1199-1203, 1421-1427, 1488, 1496; *see generally* JA 639-640, 742-747, 754, 756-757, 763, 938-962, 965-977, 980-984, 1421, 1449-1452, 1666). Rayfield made no claim for over a year that it was entitled to the incidental handling expenses, permitting Lyon to continue

---

[14] Even if detrimental reliance were required, Lyon has provided evidence in this regard. (*See* JA 565-567).

50

performance and to continue to incur costs for which it now seeks as "revenue." Further, immediately prior to executing the Agreement, Rayfield acknowledged Lyon's ability to pass incidental expenses onto the customer. (JA 728-730, 739-741). Either Rayfield intended to conceal the true nature of this aspect of the Agreement, or the "crystal clear" document does not incorporate these costs as revenue owed to Rayfield, as Lyon maintains. (JA 1603). Rayfield should not benefit from these entirely inconsistent positions.

In addition, Rayfield's acceptance of Charter Revenue payments constituted a waiver of the current objection. Waiver is the intentional relinquishment of a right, which may be expressed or implied from acts or conduct that leads the other party to believe that a right has been intentionally given up. *42 East,* 722 S.E.2d at 6. As is the case here, waiver of a term in a written contract depends on knowledge of the contracting party of the pertinent facts—here, the calculation of Charter Revenues by Lyon—and conduct thereafter that is inconsistent with an intention to enforce the alleged term—here, collecting the revenue that it now argues was incomplete. *See Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 575, 589 S.E.2d 423, 428 (N.C. Ct. App. 2003). Acceptance of imperfect performance under a contract will generally be deemed a waiver of the objection. *Rhodes Construction Corp. v. Peoples' Plaza West, LTC.*, 884 F.2d 1389, 1989 WL 100678, *3 (4th Cir. 1989) (*unpublished*) (attached as <u>Exhibit A</u>). Waiver can

51

be determined as a matter of law in summary judgment when the facts have been determined. *Cullen*, 161 N.C. App. at 575, 589 S.E.2d at 428; *Medearis v. Trustees of Meyers Park Baptist Church*, 148 N.C. App. 1, 11, 558 S.E.2d 199, 206 (N.C. Ct. App. 2001).[15]

Rayfield accepted monthly payments following review of the invoices provided by Lyon. (JA 1199-1203,1421-1427). These monthly payments clearly did not include the separately itemized "handling fees," (JA 1671) and Rayfield admits the monthly submissions of summaries and invoices were clear while accepting these payments. (JA 1199-1203, 1421-1427, 1594, 1671). Were Rayfield's position justified, it should have been evident from the start of the Agreement that Lyon, in Rayfield's view, was "improperly" reimbursing itself for "handling fees" instead of passing on that money to Rayfield as supposed revenue. (JA 905, 960, 992). Instead, Rayfield waived this objection, and rather than raising an issue, paid two bonuses to Lyon that were only to be paid in instances where no default existed. (JA 570, 575-576, 1518-1519, 1523, 1696-1701). Rayfield provided its waiver in writing, by writing checks and authorizing wire transfers to Lyon *after* review of the revenue summaries and invoices. (*See* JA 1359-1362, 1363-1366, 1528-1530, 1543-1544, 1545-1547); *Hurdle v. White*, 34 N.C.App.

---

[15] Rayfield, through its conduct, waived any non-waiver clause.. *See 42 East, LLC*, 722 S.E.2d at 7 (A party to a written contract can waive a provision in a contract despite the existence of an "anti-waiver" clause).

644, 647-648, 239 S.E.2d 589, 591-592 (N.C. Ct. App. 1977); N.C. Gen. Stat. §§66-317 (2007).   Following years of operation under the Agreement and acceptance of Charter Revenue paid, Rayfield's claim is barred under the doctrine of estoppel and waiver.[16]

## CONCLUSION

For the reasons set forth above, Lyon is entitled to a judgment as a matter of law and the decision of the District Court and judgment to Lyon should be affirmed.

Defendant-Appellee Lyon Aviation, Inc., by and through its undersigned counsel,

---

[16]   The district court did not address Lyon's other defenses, including Lyon's defense of reformation based on a mistake induced by the Plaintiff's representations.  (*See* JA 141*)*; *Amwest Sur. Ins. Co. v. Vaughn*, 100 F. Supp. 2d 335, 341 (E.D.N.C. 2000)("The concealment of the character or essential terms of a contract may be considered a misrepresentation, even if not deliberate."); *Taylor v. Gore*, 161 N.C. App. 300, 304, 588 S.E.2d 51, 55 (N.C. Ct. App. 2003); *Creech v. Melnik*, 347 N.C. 520, 528, 495 S.E.2d 907, 912 (N.C. 1998).  Here, on the eve of the Agreement's execution, Rayfield apparently, given its current position in this case, made misrepresentations to Lyon acknowledging that Lyon would be permitted to pass the cost of its expenses on to its customers under the Agreement knowing Lyon would rely on it.  (JA 728-730 ("**If this is unclear we should discuss.**"  To which Townsend responded: "**Sounds good.  Thanks for clearing that up.**")(*emphasis added*) 739-741); s*ee also Metropolitan Property & Cas. Ins. Co. v. Dillard*, 126 N.C.App. 795, 798, 487 S.E.2d 157, 159 (N.C. Ct. App. 1997).  Rayfield had knowledge of Lyon's understanding and, given Rayfield's view of the "crystal clear" meaning of the Agreement, misled Lyon through its response to these emails.

**PARKER POE ADAMS &
BERNSTEIN LLP**

/s/ Eric D. Welsh
Eric D. Welsh, NC Bar # 29629
Sarah F. Hutchins, NC Bar # 38172
Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, NC 28202
*Attorneys for Defendant-Appellee*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-1405          **Caption:** Rayfield Aviation, LLC v. Lyon Aviation, Inc.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓]    this brief contains _____13,210_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 [*identify word processing program*] in 14 Times New Roman [*identify font size and type style*]; **or**

[ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Eric D. Welsh

Attorney for Lyon Aviation, Inc

Dated: 8/6/2014

# CERTIFICATE OF SERVICE

I certify that on  August 6, 2014      the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

James Robert Faucher
BENSON, BROWN & FAUCHER, PLLC
822 North Elm Street
Suite 200
Greensboro, NC 27401
336-478-6000
jfaucher@bbflaw.com

Eric D. Welsh                                            8/6/2014
_____          _____
          Signature                                       Date

# EXHIBIT A

Appeal: 14-1405   Doc: 22   Filed: 08/06/2014   Pg: 68 of 70

Rhodes Const. Corp. v. Peoples Plaza West, Ltd., 884 F.2d 1389 (1989)

884 F.2d 1389
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals, Fourth Circuit.

RHODES CONSTRUCTION
CORPORATION, Plaintiff-Appellee,
v.
PEOPLES PLAZA WEST,
LTD., Defendant-Appellant.

No. 88-3889.   |   Argued May 8,
1989.   |   Decided Aug. 22, 1989.

W.D.N.C.

AFFIRMED.

Appeal from the United States District Court for the Western
District of North Carolina, at Bryson City. Woodrow Wilson
Jones, Senior District Judge. (CA-87-172).

**Attorneys and Law Firms**

Frank Earl Riggs, Jr. (Smith, Currie & Hancock on brief) for
appellant.

Robert Bruce Wedge (Stokes, Shapiro, Fussell & Wedge on
brief) for appellee.

Before WILKINSON, Circuit Judge, HAYNSWORTH,
Senior Circuit Judge, and CHARLES H. HADEN, II, Chief
United States District Judge for the Southern District of West
Virginia, sitting by designation.

**Opinion**

PER CURIAM:

 **\*1** Peoples Plaza West, Ltd. appeals a judgment of the
district court which found that Peoples had breached an oral
contract entered with appellee, Rhodes Construction Corp., to
construct approximately two miles of roadway. The district
court held Rhodes entitled to recover the sum of $30,795.25,
the amount of the unpaid balance of an October 1, 1986

billing, and denied various counterclaims asserted by Peoples
against Rhodes. We affirm the judgment of the district court.

## I.

In the fall of 1984, Peoples purchased Benchmark Mountain,
near Highlands, North Carolina, in order to build a mountain
resort. Peoples planned to subdivide the mountain land into
lots for sale to the public. Before sale, however, Peoples
needed to construct roads, water lines, and a sewer system.
In late 1984 or early 1985, Peoples entered into an oral
contract with Rhodes to build approximately 8,900 linear feet
of asphalt-covered roadways from a public highway to the
Benchmark property and to install water and sewer lines and
systems. The parties stipulated the following terms of the
contract at trial:

1) Plaintiff was to construct a road and was to be paid $20.00
per linear foot. This was further broken down for purposes of
payment to $3.50 per linear foot for clearing; $9.00 per linear
foot for rough grading and $7.50 per foot for paving;

2) Plaintiff was to be responsible for whatever rock blasting
was necessary for road construction and was to be paid $20.00
per cubic yard;

3) Plaintiff was to be paid $9.75 per linear foot for rock
blasted for water and sewer lines;

4) The road was to consist of 6 inches of base gravel and 2
inches of asphalt;

5) Plaintiff was to clear the well sites on a time and materials
billing basis;

6) The actual construction of water and sewer lines was to be
paid for at unit prices;

7) All billings by Rhodes Construction were to be
submitted to the engineering firm of Cranston, Robertson and
Whitehurst for approval prior to payment by Peoples.

Rhodes Construction brought suit in district court claiming
that it was not paid in accordance with the terms of the
contract and that it was entitled to recover the balance of
the contract. The parties did not dispute that under the oral
contract Rhodes was to submit monthly billings based upon
the work performed; that Peoples hired the engineering firm

of Cranston, Robertson and Whitehurst (Cranston) to oversee the Benchmark Mountain project; that Rhodes was to submit its billings to Cranston for approval prior to payment; and that Peoples would not make payment without Cranston's approval.

On approximately October 17, 1986, Rhodes submitted to Peoples its billings for work, including all paving performed on the roadways, completed from "July 1 thru October 1, 1986 in the total sum of $146,152.74." Cranston, the engineering firm, approved the bill and, on November 12, 1986, Peoples paid $102,924.49. Later Peoples paid an additional amount of $12,433.00, leaving unpaid $30,795.25. Payment concededly was withheld because of Peoples' concern over the quantity of rock claimed to have been removed from the outset of the job, rather than a determination that the amount was not due and owing on the work performed during the last billing period. Rhodes sued Peoples for breach of contract. Peoples then counterclaimed for damages in excess of $700,000.00 based on claims for overbillings for rock removal. It also counterclaimed for costs incurred in securing a "turnkey" job, including the fine grading and seeding of shoulders, removal of trees and stumps, and excavation of drainage ditches along the roadway.

 **\*2**  The district court declined to award Peoples damages for delay, finding that the original contract contained no completion date and that there had been no modification of the contract to impose a May 1, 1986 completion date. The district court further found that the agreement was itemized and did not contemplate a "turnkey" job. The district court also found that Peoples was not entitled to recover on its counterclaim for alleged overbilling on rock removal under the contract. The court found too that Rhodes did not breach its contract in proceeding to apply the base and asphalt when, after being advised by Rhodes that the roadway had not been fine graded, Peoples insisted that the base and asphalt be laid down before its grand opening. Finally, the court found that Peoples breached the contract in refusing to pay the October, 1986 billing. Peoples appeals.

## II.

The parties' disagreements may be divided into several areas: first, whether the trial court erred in finding that Peoples had waived or was estopped from contesting the billings for rock blasting and removal; second, whether the court erred in not finding that Rhodes breached the contract in failing to present

Peoples with a turnkey operation; third, whether Peoples was barred by waiver from bringing a counterclaim based on latent defects in roadway construction; and, finally, whether the court erred in finding that Peoples breached its contract with Rhodes by withholding payment in November 1986 for part of Rhodes' October 1986 monthly billing.

First, we hold that the district court did not err in finding that the rock removal work was accepted by Peoples with knowledge of possible problems in measurements, or, in the alternative, that Peoples ratified the measurements when the bills were approved by its engineer and paid, thus estopping Peoples from denying their accuracy.

The parties disagree as to the appropriate measurement of the blasted rock quantity. According to Rhodes, Cranston explained from the outset to Peoples that there were different ways to measure the rock removed in order to verify how much should be paid to Rhodes. Cranston allegedly told Peoples that the best procedure for calculating blasting was to use a survey crew to map the surface before and after the rock was removed, but that this was an expensive procedure. Peoples chose to have the Cranston firm measure the excavated areas at the time the rock was blasted in order to verify the billings of Rhodes.

Brian Peoples, an engineer, also inspected the Rhodes work for Peoples. Cranston, hired by Peoples to monitor Rhodes, later testified that the amount of rock removal billed by Rhodes was not overestimated. David Peoples, who was responsible for the payments from Peoples to Rhodes, testified that he had questions regarding the rock billings from the outset of the job. He did not, however, tell Rhodes or the Cranston firm of his concerns or ask for further substantiation of the billings. Prior to the October billing, Peoples made all rock removal payments in a timely manner without raising any objections. Peoples also failed to take any corrective measures or even to convey to Rhodes its concerns before they withheld the October payment.

 **\*3**  The district court thus found that Peoples suspected the rock measurements might be in error. Under *Cantrell v. Woodhill Enterprises, Inc.,* 160 S.E.2d 476, 481 (N.C.1968), "[w]here work is accepted with knowledge that it has not been done according to the contract or under such circumstances that knowledge of its imperfect performance may be imputed the acceptance will generally be deemed a waiver of the defective performance." The district court did not err in holding that Peoples' timely payment without objection of the

**Rhodes Const. Corp. v. Peoples Plaza West, Ltd., 884 F.2d 1389 (1989)**

rock removal billings and the approval of such payments by the very engineer it had hired to oversee the project operated as a waiver of Peoples' claims for overbilling on the rock removal.

The parties also disagree over the road construction work itself. Peoples' claims that the $20.00 per linear foot of roadway also included an agreement to furnish a "turnkey" roadway. Specifically, Peoples claims that the unit price included cleanup of the site, removal of stumps and trees, slope dressing, drainage construction, and seeding of the road, slopes and embankments. As the district court noted, however, if the $20.00 per linear foot price was to cover a turnkey operation, it would be inconsistent to then break that price into $3.50 for clearing the right-of-way, $9.00 for "rough grading," and $7.50 for paving. We agree with the district court that it seems unlikely that the oral contract would have specified a price for rough grading and yet assumed the inclusion of fine grading and seeding. We therefore affirm the denial of Peoples' counterclaim for the costs of finishing the slopes and ditches.

Peoples also claims that there were latent defects in the road for which Rhodes had been paid. Peoples alleges that there were not six inches of stone base at the time the asphalt was applied, and that rocks could be seen protruding from the asphalt in various locations. An independent engineering firm in Charlotte, North Carolina, hired to test the road, confirmed the rapidly deteriorating condition of the roadway, the inadequate drainage, and the absence of six inches of base and two inches of asphalt.

The district court, however, credited the testimony of Billy Richard Rhodes that he advised Peoples that an improperly prepared sub-base would lead to problems with the road at some future date and that Peoples insisted that the work proceed notwithstanding. We see no basis to overturn the finding of the district court that Peoples waived the contractual specifications in order to accomplish completion of the roadway for the "grand opening" of the project. Rhodes therefore did not breach the contract in proceeding to apply the base and asphalt in the manner it did.

Finally, Peoples appeals the district court's finding that it breached the contract by failing to pay the full October billing from Rhodes. The court found that Rhodes was entitled to receive $30,795.25, the unpaid balance of the October 1, 1986 billing, and appropriate interest. We affirm this holding of the district court because Peoples has not adduced any valid reason to excuse its payment of the balance of the October 1986 billing.

**\*4**  For the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED.*

**Parallel Citations**

1989 WL 100678 (C.A.4 (N.C.))

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.